## EXCHANGE NATIONAL BANK v. CHAPLINE.

### Opinion delivered June 23, 1913.

1. BILLS AND NOTES—NEGOTIABLE NOTE.—A note made by the directors to a bank, in which it is recited that the same is given to make up the shortage of the cashier, and providing that the makers shall be reimbursed out of any of the missing assets which shall be discovered, is non-negotiable, and a holder, although he takes before maturity, takes subject to all equities and defenses available between the original parties. (Page 248.)

2. BILLS AND NOTES—PAYMENT BY JOINT MAKER—EFFECT.—Where one of the joint makers of a note pays the same, the note is extinguished except for the purpose of contribution from the co-makers to the party paying it. (Page 248.)

3. BILLS AND NOTES—ENDORSEMENT—LIABILITY OF ENDORSER.—Where a note is made to a bank by its directors, to cover the shortage of its cashier, and the same in endorsed by the cashier, upon the sole direction of the president, who is one of the directors, for the purpose of enabling the president to hold the other makers to contribution, the endorsement is for accommodation merely, and does not operate to make the bank liable to one with knowledge of the fact, and the endorsement carries with it no guarantee of payment. (Page 249.)

4. BILLS ANL NOTES—NON-NEGOTIABLE NOTE—LIABILITY OF ENDORSER.—Where the payee of a non-negotiable note endorses the same, the endorser is not liable thereon, unless the assignment is made in a form from which an intention to guarantee the payment of the note may be inferred, or induces the assignee to take it by an agreement, express or implied, to that effect. (Page 249.)

Appeal from Lonoke Chancery Court; *John E. Martineau*, Chancellor; affirmed.

STATEMENT BY THE COURT.

The Merchants & Planters Bank, in a suit brought by T. B. Goldsby and other stockholders, was by the Lonoke Chancery Court placed in the hands of George M. Chapline, receiver, on December 15, 1911. On the 23d of April, 1912, the Exchange National Bank, a creditor of the Merchants & Planters Bank, filed an intervention, which alleged various transactions with that bank and the following among others: That on December 11, 1909, R. E. Eagle, S. B. Allen, Frank Barton, T. B. Goldsby and J. S. Swaim had executed their joint and several

promissory note to the Merchants & Planters Bank for $13,848.12, due and payable on or before January 1, 1912, with interest from date until paid at the rate of 6 per cent per annum, which note was endorsed by the Merchants & Planters Bank and acquired by appellant for value before maturity.

This litigation grows out of the execution of that note and its transfer to appellant. It appears that on or about December 9, 1909, the officers and directors of the Merchants & Planters Bank were informed by Mr. Frank Wittenberg, who had been employed to audit the books of that institution, that its cashier, J. C. Goodrum, Jr., was short in his accounts with the bank in the sum of $13,848.12. The president of that bank, R. E. L. Eagle, immediately called a meeting of the directors and it was agreed by them that they would make good the shortage to the bank at once. The cashier denied that he was short in that sum, or any other, but agreed to and did convey all his real estate to W. P. Fletcher to hold in trust, with the understanding that if upon further investigation of the books of the bank a shortage was found that the property should be conveyed to the directors of the bank, who had made good the shortage to the bank. On the 11th of December, 1909, the directors of the bank executed the following note to the Merchants & Planters Bank:

"$13,848.12.                                    No...........

"England, Ark., December 11, 1909.

"On or before January 1, 1912, we promise to pay the Merchants & Planters Bank, thirteen thousand eight hundred and forty-eight dollars and 12/100 at the rate of 6 per cent per annum from date until paid.

"R. E. L. Eagle.
"S. B. Allen.
"T. B. Goldsby.
"Frank Barton.
"J. Swaim.

"It is hereby agreed and understood that this note is given to the above bank, for difference in the assets

and liabilities as shown upon their books on December, 1909, which discrepancy or difference occurred while the records and the assets of the bank were in the custody of J. C. Goodrum, Jr., cashier.

"It is further agreed and understood that should any of the missing assets be recovered, that the makers of the above note shall be paid the cash value of what is recovered, in proportion to the amount each may pay, or be liable for upon above note."

This note was never turned over to the Merchants & Planters Bank and there was no record of it whatever on its books. The bank auditor declined to accept this note in satisfaction of the shortage, and refused to certify that it had been made good until the amount thereof had been deposited in the bank. R. E. L. Eagle was not only the president of the bank, but he appears to have been one of the principal owners of its stock and to have largely dictated its policy and directed its management. At that time he was regarded as a man of large wealth and was extensively engaged in business at England, Ark., which he was conducting under the name of Eagle & Co. When the examiner declined to accept the directors' note in satisfaction of the cashier's shortage, Eagle executed the following check:

"England, Ark., December 13, 1909.
"Merchants & Planters Bank:
    "Pay to the order of M. & P. Bank $13,848.12, thirteen thousand eight hundred and forty-eight 12/100 dollars. For note by directors to make good Goodrum shortage on bank books.
                                        "Eagle & Co."

On the evening of the same day Eagle executed this check, he presented to the acting cashier, R. L. Buffalo, the directors' note to the bank with the request that he endorse same.

The evidence shows that this was the first knowledge Buffalo had of the existence of this note, but he endorsed the same at the request of Eagle, who explained to him that he desired this done in order that

he might recover from the makers of the note or at least some of them, their *pro rata* share of the amount he had paid out in the event Goodrum's property was not sufficient to cover the shortage. On this same day Eagle, as president of the bank, issued a notice which he sent to the customers and stockholders of the bank and had published in which the statement was contained that "The directors of the bank have made good the shortage out of their personal funds for the full amount of the assets that are missing," and concluded with the statement that "We hope Mr. Goodrum may locate and deliver to the bank the missing assets. If he does, those who paid the shortage to the bank will have their money refunded." Eagle testified that he suspected the existence of this shortage before it was announced by the bank auditor and had conferred with H. C. Rather, the cashier of appellant bank, before the employment of this auditor, and that the examination of the books was made at Mr. Rather's suggestion. Two days after the execution of the directors' note for the amount of the shortage, Eagle & Co. negotiated a loan from appellant for that exact amount and pledged with appellant as collateral security the note which he and the other directors of the Merchants & Planters Bank had executed to that bank, together with a number of the individual notes of Eagle & Co. Eagle conferred with the cashier of appellant bank and represented to him that he and the other directors desired to make good the shortage of the cashier of their bank, so that the bank could continue in business and the depositors would not become frightened; that the directors were responsible for the shortage and would make it good, and for that purpose wanted to borrow that amount of money. Mr. Rather conferred with the discount board of his bank, and, after having done so, wrote out a note and had it signed by Eagle & Co. and took from Eagle the directors' note as collateral, and in addition also took as collateral certain notes of Eagle & Co., amounting to something over $4,000. There-

upon Eagle drew a draft on appellant bank in favor of the Merchants & Planters Bank as follows:

"$13,848.12.     England, Ark., December 14, 1909.

"Demand pay to the order of M. & P. Bank thirteen thousand eight hundred and forty-eight and 12/100 dollars, value received, and charge the same to the account of Eagle & Co.

"To Ex. Nat. Bank, Little Rock, Ark."

And this draft was credited to the account of Eagle & Co. on the books of the Merchants & Planters Bank.

At the time of these transactions neither Eagle nor the Merchants & Planters Bank owed appellant anything, and both were regarded by appellants as being perfectly solvent and good for any reasonable line of credit. When Eagle & Co.'s note to appellant became due, he gave it a check on one bank for $7,000 and a check on another bank for $48.12, and executed a new note for $6,000 to appellant, which continued to hold the directors' note as collateral. From then on Eagle & Co. continued to do an increasing amount of business with appellant, and made payments and executed new notes as old ones would mature, until he failed in business, when his indebtedness to appellant amounted to $31,982.34. Later, too, the Merchants & Planters Bank became indebted to appellant, and at the time of the appointment of the receiver to take charge of its assets it was indebted to appellant in a large sum of money.

The evidence upon the part of the directors of the Merchants & Planters Bank is to the effect that Eagle told them he desired the execution of this note that he might be able to hold Goodrum's property for his shortage, and that he personally would make good and be responsible for any deficit after Goodrum's property had been sold; and the proof is that the directors knew nothing of the loan to Eagle & Co. by appellant bank and the use of their note as collateral, and one of the directors testified Eagle told him the note had been destroyed and other directors testified Eagle gave them an obligation

in writing to not hold them for any liability upon the note.

The court made a finding upon other transactions between the two banks which is not questioned, but also found "that the Exchange National Bank is not entitled to recover against the receiver of the Merchants & Planters, or to have paid out of the assets in the hands of the receiver, the note for $13,848.12, executed by the directors of the Merchants & Planters Bank and by it endorsed in blank and pledged by Eagle & Co. with the Exchange National Bank as collateral security for a like amount borrowed by Eagle & Co. from the Exchange National Bank of December 14, 1909."

*James B. Gray,* for appellee.

1. The note executed by the directors to cover the Goodrum shortage was non-negotiable, and a holder before maturity would take subject to all defenses and equities which were available between the original parties. Payment by one of the makers would have the effect to keep the note alive in his hands as evidence of his right to contribution from his comakers. This right may be transferred to a purchaser for value. 2 Daniel on Neg. Instruments, § 1236, and cases cited.

The endorsement in blank by the acting cashier only operated to transfer the legal and equitable title, and carried with it no guaranty of payment. 4 Am. & Eng. Enc. of L. (2 ed.) 479; 103 Cal. 319; 52 Mich. 525; 152 Pa. St. 598; 1 Am. Lead. Cases, 302.

2. If the assistant cashier intended to endorse the note to Eagle & Co. it was an accommodation endorsement for which the Merchants & Planters Bank, a corporation, could not be held liable. Kirby's Dig., § 839; *Id.,* § 830; 95 Ark. 368; 9 L. R. A. (N. S.) 192, notes; 2 *Id.* 525, notes; 116 N. Y. 281, 22 N. E. 567; 90 N. Y. Supp. 355.

*Moore, Smith & Moore,* for appellant.

1. If the loan of appellant was made for the use and benefit of the Merchants & Planters Bank, the latter

is liable to appellant in an action for money had and received, although the note is non-negotiable. The note was, nevertheless, assignable by endorsement of the payee in blank so as to authorize the endorsee to sue upon it in his own name. Eagle's direction to the cashier to endorse the note was evidently for the purpose of transferring to appellant the obligation of the Merchants & Planters Bank to repay the money had and received from appellant. Obtaining the loan upon the note to restore the bank's capital furnished the benefit and consideration to the endorser. 95 Ark. 368.

2. If Eagle became the purchaser of the directors' note, appellant, as pledgee of the note, could maintain an action against the Merchants & Planters Bank as upon an original promise, or as a guarantor. 3 Mass. 274; 13 Metc. (Mass.) 262; 8 Wend. (N. Y.) 403; 68 N. W. (Ia.) 579; 6 Ia. 216.

SMITH, J., (after stating the facts). There is no doubt that the loan made by appellant was to Eagle & Co. and not to the Merchants & Planters Bank, and it is equally as certain that Eagle deposited the note of himself and the other directors as collateral security for this individual loan made to him. But this was a non-negotiable instrument, and, as such, a holder who took it even before maturity took it subject to all defenses and equities which were available between the original parties. Am. & Eng. Enc. Law (2 ed.) vol. 4, p. 133; *Wettlaufer* v. *Baxter*, 26 L. R. A. (N. S.) 804.

The interest of the appellant therefore was the same as that of Eagle, and the note was subject to any defense against it which would have been available against him. As a joint maker of this note, it was Eagle's duty to pay it, and, having paid it, it could be kept alive only for the purpose of contribution from his comakers. The consideration for this note was the satisfaction of the cashier's shortage, and this was paid to the Merchants & Planters Bank with Eagle's individual check, when the bank auditor refused to accept the note as payment.

A joint note is extinguished by an assignment to

one of the makers on payment by him, leaving him a right of action against the others for contribution. 7 Cyc., note 16, p. 789; *Stevens* v. *Hannan,* 49 N. W. 874; Daniels on Negotiable Instruments, vol. 2, par. 1236.

The evidence of Buffalo, the cashier of the Merchants & Planters Bank, was that when Eagle paid the shortage by a check for its amount against his individual account, Buffalo knew nothing of this note and never had it in his possession, and no record thereof was ever made on the books of his bank, and later in the day, after Eagle's check had been paid, Eagle brought the note into the bank and directed Buffalo to endorse the bank's name thereon in order that he (Eagle) might hold one or two of the directors liable to him for their *pro rata part* of any sum he might finally fail to realize from Goodrum's property; and no authority for this endorsement was given him except Eagle's direction above stated.    This transaction amounted to a mere accommodation endorsement, and under the circumstances here stated did not operate to make the bank liable to one charged with notice of that fact. *Simmons National Bank* v. *Dilley Foundry Co.*, 95 Ark. 368; *Cook* v. *Tubbing & Webbing Co.*, 9 L. R. A. (N. S.) 193.

Whatever may have been the representations of Eagle to the appellant, or whatever may have been its expectation flowing therefrom, the fact remains that the note under consideration is non-negotiable, and while the endorsement by the cashier of the bank to which it was payable was a transfer of it, yet such transfer carried with it no guaranty of its payment, for such is the law, unless the assignor makes the assignment in a form from which an intention to guarantee the payment of the instrument may be inferred, or induces the assignee to take it by an agreement, express or implied, to that effect. 4 Am. & Eng. Enc. Law (2 ed.) 479, and cases cited.

Upon the whole case, we think the chancellor's finding is not contrary to the preponderance of the evidence, and the decree of that court is accordingly affirmed.

KIRBY, J., dissents.